May I please report, Nathan Lane on behalf of Taiwan Sumida Bank Products. I apologize to the reporters who were expecting a different Nathan Lane, but I am what you have today. Mr. Lane, speak up a bit, please, sir. Speak up a bit. Pardon me? A little bit louder. Yes, I'll do my best. Thank you. I'd like to make three points. First, this case, the Taiwan Sumida Electronics case, must be reversed if the court determines that the companion case that you have just heard argued would be affirmed on the issues of invalidity. The principles of collateral estoppel would require that result. This jury found the patent valid, right? If the patent is invalid. This jury, your jury, found the patent valid, right? This jury found on the evidence before it that the evidence was not sufficient to find the patent invalid. It didn't find the patent valid. Thank you. And as this court knows, the Mendenhall case provides that collateral estoppel will attach even if the issue is raised during the course of the appellate proceedings. And in fact, that is the first time it could have been raised in this case. That's provided we find, we affirm the first case. If you affirm in the first case on the issue of... I think that if we affirm it, then you're saying that the judgment here should be vacated. That's correct. Not reversed, but vacated completely. Vacated and... In all respects. I don't think it needs to be sent back to the district court, because the determination of collateral estoppel can be made in this court. Now, what about the prejudice issue that was raised before regarding the presentation of the jury? Was that one in which the same experts were used here? They were different experts. One of the experts was the same. That is, Dr. Ryan testified on behalf of the plaintiff in both cases. That is my understanding. In the case in Eastern District, Texas, the defendant's expert was different. And there was no independent expert. Was there a request made to Judge Ward that he appointed an independent expert? There was no request made of Judge Ward to appoint an independent expert, and he did not determine that it was necessary to do so. I'd like to talk a little bit about the willful infringement issue, because the briefing in this case was completed on February 28th of 2007, and this court's Seagate opinion was rendered in August of 2007. As you know, the Seagate opinion changed the legal standard applicable to willful infringement and now requires that the conduct be objectively reckless. The conduct in this case cannot be said to have been objectively reckless. Indeed, the best evidence of that is the District Court's own words. And I refer to page A8 of the record, which is the court's determination of the J.L. Morell motion. And at that point, the court said, and I'm going to quote, it is true that the issues in the case were close, and there was an investigation into infringement and validity. Close quote. Close questions and investigations into infringement and invalidity are not the stuff of objective recklessness. I think it is also important to note that the evidence upon which the District Court relied to find willful infringement is not the type of evidence that can properly be introduced for that purpose. Are you arguing for our simply vacating that, or are you arguing that we send it back to the trial object? We argued under the old standard that the standard of willfulness had not been established. In light of Seagate, is your argument that given Seagate, it needs to go back for retrial on that issue? We think this court can make that determination because the evidence is simply not there that would suffice to support a determination of willfulness. On the other hand, TSC knows of the patent. It knows of the U.S. buyers. It decides to satisfy the Dell specs. It knows that Dell sells into the United States. It broadly broadcasts that it is indemnified when somebody asks them, is there a chance that you are an infringer? Why couldn't all of that kind of look a little reckless? Like, hey, we are going ahead with this, and by the way, we are indemnified, so we don't care. I mean, it sounds like, at the minimum, we've got to send this back and have the court take a look. There might indeed be recklessness under that set of factors. I think that it's important to take the sequence. First of all, I'm going to postpone for a second what the court did and discuss now what the Seagate standard would require. First, we're talking about May 28, 2002. That's when the patent issued. That is the first time that Taiwan Semida Electronics could have become aware of the patent. In fact, sometime after that, and the record isn't clear on this point, representatives of O2 Micro came to Taiwan Semida and said, you have some trouble with the use of MPS chips that were then being used, that were being used in the manufacture of inverter modules in Taiwan prior to the issuance of the 722 patent. They said, we have some problems with that. So what did Taiwan Semida do? And have in mind, I think, that it's important to understand that we're talking about a chip. We're talking about a chip that Taiwan Semida does not manufacture. We're talking about a chip that Taiwan Semida purchases from MPS. So after May 28, 2002, and before this action was filed, in January of 2003, which Seagate suggests is the relevant period, Taiwan Semida went to its supplier, MPS. We all know that patent infringement includes using a patented invention. If the record would show that Taiwan Semida was very reckless in going forward with the use of this obviously infringing device, knowing that it was going to the United States, wouldn't that support a finding of Wilkins? And if we're talking about what period of time? Because Seagate suggests that you look at the period of time. But those are all, my point is simply there are facts here that would perhaps suggest that the district court should take another look. Number one, it's not obviously infringing, as the record here shows. Number two. Jury found it to infringe, right? Jury found infringement, but the jury erroneously found that there was induced infringement. Because Taiwan Semida manufactures this product in Taiwan. Taiwan Semida sells the product to Samsung Electronics in Taiwan. It is incorporated with panels and sold to Dell in Taiwan, and there is absolutely no evidence there. Is there any question that it was coming to the United States? There's no evidence that, in fact, these inverter modules do. Samsung had multiple suppliers. And there was an absence of evidence sufficient to support the induced infringement, as we have separately argued. And I've noticed that argument, yes. So as far as the willfulness is concerned, I think that the evidence in this case simply does not support the determination of willfulness. I might just make one other observation. If you look at A7 and A8, the evidence upon which the court primarily relied was evidence of activities that took place in the year 2000, two years before this particular patent issue. And that is not proper evidence, and was not then, and is not now. On the issue of inducement, which I'd like to address very briefly. First, as I just indicated, the evidence in the record does not support direct infringement that is necessary or to be shown on a case-by-case basis. Second, and I think that this is a key issue. What is the infringement? What is the direct infringement by Dell Computer or anybody else? It isn't the manufacturing of the product. That's accomplished in Malaysia. It is the importation or sale in the United States of the product. There is absolutely no evidence that Taiwan Tsumida did anything to encourage Dell to import these products into the United States. There is absolutely no evidence whatsoever that Taiwan Tsumida said to Dell, hey, sell these products in the United States. Those are the acts of direct infringement, and the record is completely devoid of any statement or proof that Taiwan Tsumida had anything to do with that. But if Taiwan Tsumida knew that they were eventually going to be sold to Samsung or Dell, and their market in the United States was 50% of their total market, isn't there an assumption that some of those chips would be imported into the U.S.? The DSU medical case and the Supreme Court's Boxer case clearly indicate that your knowledge of the possible infringement is insufficient. We would submit that the possibility, or even the knowledge, that these products may be distributed in the United States is insufficient to support a fine of industry. Even knowing that 50% of those products would be sent to the United States? I don't think there's any proof of that. The question is not whether there's any proof of it. Assuming it was true, would that be enough? No, because this is completely up to Dell. How about if it was 100% of the product was to be imported into the United States? I think that you have to also take into account that Dell was well aware of this case. Dell knew what it was doing. Dell made the decision by itself without anybody inducing it. I think you have to look at the conduct of Taiwan Sumida. Taiwan Sumida had nothing whatsoever to do with the termination by Dell. Your argument is that Taiwan Sumida's knowledge of what Dell does is irrelevant. Unless Taiwan Sumida said to Dell, please import these into the United States. It must be something. Something that promotes the importation of the United States. Under the DSU standard for infringement under inducement, we have a should-have-known problem. Why shouldn't you have known they were going to the U.S.? You do have a should-have-known problem. In some sense, the question of what one should have known, should have known that the acts would cause infringement. That was up to Dell. Taiwan Sumida's acts were merely to sell a product to Samsung, who sold it together with other products, that included other parties involved with Dell. Maybe it should have known the products would end up in the United States, but that's not the same. It should have known that its acts would cause the infringement of the conduct. Thank you, Mr. Blank. Thank you, Your Honor. Let me start with the last point. The 30B6 witness that was presented by Taiwan Sumida in this case, a gentleman named Dawson Wu, testified not only in his deposition, but at trial, that he knew that, and I'm referring to a trial record at A962, that he knew that Taiwan Sumida modules were going into the United States and Dell laptop computers. Now... Well, Mr. Blank doesn't say that, and Mr. Blank doesn't dispute that, I think. But he's saying what Taiwan Sumida knew is not the issue. The issue, according to Mr. Blank, is what did Taiwan Sumida do with that knowledge? Did it encourage or do something that affirmatively called for the infringement to occur? And I'm not sure I totally agree with that as a legal test, because this court's DSU opinion, I think, sets forth what the test is for inducement, and it was very focused on that. And I think we meet those tests in this case. Here, Taiwan Sumida knew, and by the way, there was contention in the reply brief that certain exhibits were not part of the record, and I'd like to correct that, because they were. And they bear on this issue. So if you'll indulge me, at page four of the yellow brief, Taiwan Sumida said that A3643-44 were not part of the record. Indeed, they were part of Defendant's Exhibit 224, admitted on November 14th. The importance of these is that those were the documents showing the Taiwan Sumida modules inside the laptop computers that were purchased in Texas. Clear evidence of direct infringement in Texas, in the United States, Taiwan Sumida modules. At page six, they said A2881 was missing. That was not in evidence. That's not true. It is Schedule B to the Davis Expert Report, Plaintiff's Exhibit 327, also admitted on November 14th, 2005. The importance of that exhibit is that that's the exhibit that establishes that 60% of Dell's manufacturing actually goes into the United States, so 60% of the sales of Taiwan Sumida, which I don't think really is credibly in dispute here. They knew that this was happening. They had meetings in Texas with Dell. Initially, in this case, they moved to dismiss the lack of jurisdiction, and we were able to prove that they had made numerous trips to Texas to meet with Dell engineers for the purposes of persuading them to use their modules and to use them in their laptop computers, the very products that are coming into the United States. So if you want, if you believe that DSU requires affirmative acts, we have a plethora of affirmative acts here, and the trial court found that their contention about lack of jurisdiction was not well taken, and indeed that evidence was also presented. I would refer you to... So do we have to win the appeal in the Northern District of California case in order to prevail here? I don't believe we do, and let me tell you why. I believe a judgment in a case is enforceable unless and until the patent is declared invalid. We have a judgment in this case. It is a judgment that is a set amount. There's nothing further to be done. Even if you were to send this case back on willfulness, which I can see is a concern in light of the Seagate case, it still doesn't upset the fundamental ruling in this case and the damage award that's been made. Hypothetically, if we do affirm the Northern District of California opinion, do we then vacate this case? What do we do with this case? No, you don't vacate this case. This case does not have to be vacated on that basis. What would happen, of course, is that any future enforcement would be unavailable to us. This particular judgment, however, was rendered at a time when the patent was in full force in effect, when the jury found it valid and the jury found it infringed. The judgment is not final because it's up here on appeal. I agree. Now, if we decide your case first and then decide that case, does that mean you win? But if we decide that case first and then decide your case, you lose? When I have looked at this issue in prior cases, and I can see that I haven't looked at it for the purposes of this argument, but in prior cases, my recollection is that the critical date is the date of the judgment that was entered in the district court, and the judgment entered in the district court is enforceable as of that date, which would make this enforceable, and I'd be glad to submit a letter of authority on that after the hearing. But would we be able to reverse it at that point and send it back to the Judge Board and have them take into consideration the first case? If you vacated the judgment in this case and sustained the finding of invalidity, then this case would be over. Vacating the judgment would do that because we would no longer be able to enforce it. But is that the proper thing for us to do? That is not the proper thing for you to do. Not at all. How could we hold in the first case, hypothetically, assuming we were to hold in the first case that the patent was invalid on either obviousness or the sale issue, and then we turned around to deal with this case. What are our choices at that point? Your choice in this case is either to affirm the judgment of the trial court or not on the merits of this case. And I believe this case should be affirmed independently and regardless of what you do in the other case. Obviously, I don't think you would win. So you would win your judgment in this case even though we all agree, hypothetically, that the patent on an issue of money is invalid. I believe that that is… It's a puzzle, isn't it? Well, it is a puzzle, but it was not invalid at the time that the judgment was entered into the lower court. Didn't the Hall case say something different than that? I don't know. I can tell you, as I said, that I dealt with this… …and applied it to another case. I think it would apply to another case going forward. But remember, this case has an extant judgment that is being reviewed. So that's why I said in response to Judge Barsh's question, if this case were vacated and sent back, vacated in its entirety and sent back, there would be no new trial because if you affirmed, we wouldn't have a patent to assert anymore. Obviously, I don't think that should be the result. This is an academic discussion. But nonetheless, I believe that the lower court decision would probably be enforceable. And I would like an opportunity, as I said, to send a short letter to the authorities that I believe support that proposition. The issues raised here, I think the evidence clearly supports the merits of this case. There was ample evidence of activities by Taiwan-Semida in the United States, aiding, abetting, and encouraging Dell to use Taiwan-Semida modules in its laptop computers. Well, I have a problem with the statement that you make in your brief on page 36, indicating that TSC's pre-May 2002 act's evidence is intact to induce infringement of the earlier related 615 patent. And those activities continue unchanged after the 722 patent issue. Now, if in fact that's the case, the 615 patent would be declared to be invalid. They're not infringed. Now, you're saying that the inducement for the earlier patent then changed over to the 722 patent after it issued. Is that a correct statement? No, I believe what we're saying is that you have to look at the course of conduct of the party here and the party's disregard for patent rights going forward. The 615 patent was decided on basically a pleading technicality. It was a pleading technicality. It was not on the merits. The 722 patent issue, and Taiwan-Semida admits that it knew about the 722 patent shortly after it issued. There's no question about that. After it issued in 2002. Correct. But the pre-2002 activity should not be attributed to them as far as inducements and so on should be. Based upon the 615 patent. If that was the only acts that we had and they stopped those sales when they learned about the 722 patent, I would agree with you. But I think if you look at Supreme Court cases, for example, I believe it's a standard oil case, acts that don't directly support culpability can nonetheless be used to show the acts of the parties and the intent of the parties. And that is certainly clear here. The intent of Taiwan-Semida was to sell these products to Dell knowing full well they were going into the United States to meet with Dell in the United States, to aid and facilitate that use in the United States, to seek indemnity from MPS because they knew about the potential liability of the records replete with emails and other communications showing that. So this is clearly a situation that meets all of the DSU requirements. And if you look at the jury instruction that was given in this case, it fully meets the DSU requirements. I'm looking at the trial record at A1135. The jury was instructed as follows. Quote, the plaintiff must show that the defendant actually intended to cause the acts that constitute a direct infringement and the defendant knew or should have known that its actions would induce actual infringement. The defendant also cannot be liable for inducing infringement if it had no reason to be aware of the existence of the act. That's the jury instruction that is fully compliant with the DSU case and that's the jury instruction in this case. There was ample evidence to support it. We believe the finding of validity and infringement in this case should be affirmed. The jury question. Yes, the jury finding, absolutely. We shouldn't second guess it. There was no independent expert in this case to overly influence the jury or to make it a two-to-one argument or to otherwise skew the result. Absolutely. I understand. This was a fair trial, Your Honor. And by the way, Dr. Ryan, who is a patent agent, was the expert in this case and was the expert in the other case as well. It was certainly far more, well, I don't want to get into the other case, but I think that it was a very fair position in the other case. I know you'll deal with it accordingly. If you have any questions, I'd be glad to respond, but I think I focused on the issues that you indicated you had questions about. Thank you, Mr. Brunslow. Thank you. Mr. Lane, you have a little less than two minutes remaining. First, I'd like to make sure that the Court is aware of the basis on which we've used to support the collateral estoppel judgment. That is the case of Mendenhall v. Aztec. I think that was the first hearing. 26F3rd. Yes, the Federal Circuit panel on that case reversed an earlier Federal Circuit panel finding of validity. So it had gone, the Federal Circuit itself had already affirmed an earlier case of validity, and yet upon the finding of invalidity in the second case, it went back and vacated. That's correct. And the other point that I'd like to make— So it doesn't matter what order we hear you. We decide these cases, and that's what you're telling me. If you decide the case, the first Northern California case, in favor of the invalidity of the patent, the Mendenhall case clearly provides the authority for this Court to vacate the judgment based on collateral estoppel. And vice versa. Excuse me? Even if we decide that case first and decide the first case second, we can still vacate the first case. That's correct. Under Mendenhall. Yes. One further point, and this deals with the indemnity agreement that Greta mentioned earlier. The indemnity agreement, in fact, supports a position that I want to meet with being completely non-reckless. And that is because it said to MPS, look, we don't know what's in this chip, but we want you to stand behind it and put your money where your mouth is. And that's exactly what they did. There is some ambiguity in the facts. No question. But whenever you have ambiguities, the fact finder ought to make the final decision, right? So we would probably send it back. The facts here are negative. They're not related to the scrutiny of these points. All right. Thank you very much, Mr. Blank. Thank you. Our final case today is Walsh v. Dewey.